

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>KASSIAN WILLIAM FREDERICKS<br><br>                Defendant. | No: 3:25-mj-00791-KFR |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, KATIE YARBOROUGH, being first duly sworn, hereby depose and state as

follows:

**INTRODUCTION AND SPECIAL AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a criminal complaint

and arrest warrant for **Kassian William Fredericks** (hereinafter "SUBJECT").  An

investigation has revealed that there is probable cause to believe that the SUBJECT has

committed violations of Title 49 United States Code § 46504 (interference with flight

crew members and attendants).

2.      I am familiar with the information contained in this affidavit based upon the

investigation I have conducted, in conjunction with local law enforcement officials,

which has included exchanging information with law enforcement officers and others;

reviewing notes, reports, database records and other information acquired during this investigation; and reviewing evidence obtained therefrom; and interviewing witnesses.

3.  Because I submit this affidavit for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me or the government. I have only included those facts necessary to establish probable cause to believe that SUBJECT has committed a violation of 49 U.S.C. § 46504.

4.  I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI). I have been a SA with the FBI for approximately seven years. I am currently assigned to the White-Collar squad in the FBI Anchorage Field Office. During my time with the FBI, I have led and participated in investigations involving violent crimes, sexual misconduct, threats, robberies, health care fraud, fraud against the government, and drug trafficking. I also investigate violations of federal law occurring in the Special Aircraft Jurisdiction of the United States.

## RELEVANT STATUTES AND REGULATIONS

5.  The relevant statutory authority and terms used in this affidavit and its attachments are described and defined below.

a.  49 U.S.C. § 46504, states: "An individual on an aircraft in the special aircraft jurisdiction of the United States who, by assaulting or intimidating a flight crew member or flight attendant of the aircraft, interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties, or attempts or conspires to do such an act, shall

Case 3:25-mj-00791-KFR    Document 1-1    Filed 12/12/25    Page 2 of 10



be fined under title 18, imprisoned for not more than 20 years, or both. However, if a dangerous weapon is used in assaulting or intimidating the member or attendant, the individual shall be imprisoned for any term of years or for life."

**PROBABLE CAUSE**

4.      On December 10, 2025, at approximately 8:10 p.m., FBI Ops Center in the Anchorage field office received a phone call from Anchorage Airport Police Department (AAPD) dispatch, who reported that a passenger aboard Alaska Airlines flight 87 due in at 2033 hours from Deadhorse had a male passenger named Kassian Fredericks (SUBJECT) who attempted to open a cabin door to exit the plane in-flight. SUBJECT had been restrained, and airport dispatch was advised SUBJECT may also be overdosing on something.

5.      Alaska Airlines flight 87, registered aircraft number N612AS, departed from Dead Horse, AK on December 10, 2025, and was scheduled to arrive in Anchorage at approximately 8:24 p.m. that same day. After the flight landed at the Ted Stevens Anchorage International Airport, AAPD officers and I conducted the interviews of the flight crew and witnesses. Anchorage Fire Department made the decision to have SUBJECT transported to Providence Hospital in Anchorage, Alaska for further medical assessment. AAPD transported SUBJECT to Providence Hospital immediately upon the plane landing.

6.      During the interview of passenger witness J.M., he stated he was sitting a few seats in front of SUBJECT during the flight. During the flight, J.M. got up to use the restroom in the back of the plane. When he was exiting the lavatory, he saw SUBJECT

aggressively trying to open the rear cabin door. J.M. ran over to SUBJECT, who already had the arm of the cabin door moved upward and grabbed him trying to stop him. J.M. turned around and yelled to some male passengers at the back of the plane to come and help him. Two other male passengers got up to help. J.M. states SUBJECT was so strong; it took him and the other two male passengers to restrain him and sit him down. SUBJECT kept trying to get up, and J.M. told him to take it easy and calm down. SUBJECT verbally said repeatedly to J.M. during this time, "I need to call my mom." SUBJECT then told J.M. that he thought he was overdosing. He also asked J.M. for a cigarette, which J.M. told him he was not allowed to smoke on the plane. SUBJECT then asked J.M., "how do I break the window? I don't know how to break it." J.M. told him he could not break the window. J.M. described SUBJECT as "crazy." When J.M. asked him why he was trying to open the cabin door, SUBJECT stated he "need[ed] air and to get out of here." J.M. did not smell any alcohol on SUBJECT but observed SUBJECT shaking with his whole body.

7.      The two male passengers, E.M. and M.P., who assisted with holding and restraining SUBJECT were interviewed. They both were sitting in the back of the plane. E.M. noticed SUBJECT before the incident, as E.M. was sitting directly behind SUBJECT. He noticed SUBJECT was shaking a lot and thought maybe he had a medical condition. At one point before the incident, he noticed SUBJECT was looking back and talking out loud. E.M. took out his earbuds and asked him if he was talking to him to which SUBJECT stated no, he was not talking to him. E.M. stated no one was sitting in the seat next to him and SUBJECT continued to talk out loud to himself. Both E.M. and M.P. thought SUBJECT was acting off during this time so much so that they both moved back a row



further away from SUBJECT because they were worried SUBJECT would get physical. SUBJECT then proceeded to move and sit in different seats in his own row and then moved to the row behind his row, where E.M. had previously been sitting. It was after this that SUBJECT got up and went to the back of the plane. E.M. watched him and then was looking for the flight attendants to see if they were observing SUBJECT and were going to do anything about it, but they were in the middle of doing their beverage cart service. E.M. did not see SUBJECT attempting to open the cabin door until he heard the other passenger, J.M., yelling for help. The flight attendants wanted to restrain SUBJECT with zip ties, but E.M. thought he and the other male passengers could handle restraining him and keeping him in his seat after the incident. E.M. thought zip ties might make SUBJECT act worse and escalate the situation.

8.      After the incident and while E.M. was sitting next to SUBJECT, SUBJECT told E.M.: he was hearing voices; "they were poking him"; he was going to "OD"; and he "had to get out." E.M. stated SUBJECT kept talking to himself out loud the rest of the flight. SUBJECT kept asking to smoke a cigarette, but the flight attendants told him no.

9.      Before the incident, M.P. heard SUBJECT saying, "stop the plane, stop the plane" while repeatedly looking to the back of the plane. M.P. asked if SUBJECT was okay, to which SUBJECT responded with saying "they're flying the plane from back here." M.P. asked "who?" to which SUBJECT stated, "no, they're invisible. They're trying to take over the plane. You got to stop them." M.P. then saw SUBJECT pop a pill in his mouth and took a drink of his Gatorade he had with him. M.P. thought perhaps the pill would

calm him down, but SUBJECT proceeded to act worse. After the incident, SUBJECT told M.P. he was overdosing, to which M.P. thought SUBJECT was "tripping" on some drug.

10. During the interview of passenger witness C.S., who was seated in the row opposite of SUBJECT, he noticed SUBJECT shaking. He thought at first SUBJECT might have Tourette Syndrome but then after observing him further, he thought it did not look the same and that SUBJECT might have taken some kind of drug based on how he was acting, "twitchy." C.S. thought if it had not been the fact the plane had a lot of North Slope workers who were bigger in stature to be able to help, he thought things could have been a lot worse with SUBJECT and his actions.

11. During the interview of the flight crew and pilot, the crew stated they did not think SUBJECT was drunk, but they did think he was acting "weird and off." Flight crew member, R.J., noticed SUBJECT shaking but thought he might have a medical condition. During the time they were pushing the beverage cart to the front to start serving drinks, SUBJECT yelled at R.J., "Two shots! Two vodka shots!" R.J. told SUBJECT they would make their way back to SUBJECT once they served the previous rows first. However, SUBJECT continued to repeat himself yelling it again at R.J. That's when R.J. told the other flight attendant, he thought something was off and strange, so they stopped their service. They then noticed the passengers that were near him had moved away from him. They asked them why they moved, and they said it was because of SUBJECT's behavior.

12. The crew continued to monitor him and noticed he seemed to get more agitated. They asked passengers sitting near him to keep an eye on him. They then continued their beverage cart service. During the flight, they heard SUBJECT make a



comment saying, "The wings have disappeared. We're all going to die." Flight crew member S.G. then called the pilot to let him know what was happening. Flight crew member P.P. then went over to SUBJECT who told her the same statements he told S.G. Additionally, he told P.P. "Meth is coming out of the air vents. Everybody is freaking out." P.P. told him everything was fine, and nobody was freaking out that it was just him. He asked her for two shots to which she told him he would not be served any alcohol. P.P. thought he was becoming more and more agitated really fast. She briefly saw something in his lap and immediately asked another passenger to see what it was. She was worried he had a weapon, considering he might have torn up a coke can to make it into a weapon and poke someone. The other passenger stated it was only a pack of cigarettes in his lap.

13. When the crew heard what was happening at the rear cabin door, they went to the back of the plane and took a photo of what SUBJECT had done (shown below).



14.     The flight crew stated the strap had been ripped off and the lever had been moved upward from where it should have been all the way down. The flight crew wanted to zip tie him, but in hindsight they realize that probably would have agitated him more. The crew thought SUBJECT's behavior was due to a mixture of drugs and an anxiety to fly. At the end of the flight after landing, SUBJECT apologized to the crew and seemed to have calmed down when he was being escorted off the plane.

15.     The pilot, E.P., stated it was about three-quarters of the way from their climb out of Prudhoe Bay, just over 18,000 ft, when he got the first call from the flight attendants for their concern of a passenger's behavior. It was just after that when the pilot saw the indication light go off in the cockpit indicating the cabin door was trying to be opened. E.P. said it is inhumanly possible to pull the cabin door in with the amount of air pressure on the plane while in-flight. Though, E.P. stated he wanted to emphasize the severity of this situation which they deemed a Level 2 threat. During the flight, he had called Alaska Airlines' medic on the ground and were considering diverting to Fairbanks, but they were only approximately 18 minutes away from landing in Anchorage. Since SUBJECT was not vomiting or passing out, they made the decision to continue to Anchorage. However, this incident affected the entire crew and himself from properly preparing the cabin for arrival and compliance checks with being on the phone with the medics during descent.

16.     The crew all stated they feared for the safety of their passengers and themselves. Even though SUBJECT had not shown any physical aggression toward anyone, it was because of how erratic and "out of his mind" he was that made them feel this way. They stated even though he would not be able to open the cabin door in mid-air



with the air pressure, manipulation of the cabin door arm could have triggered the emergency slide to deploy and inflate within the plane. This could have caused serious harm to any passengers in the cabin including SUBJECT who was near the door.

17.     While SUBJECT was at Providence Hospital, an AAPD officer overheard SUBJECT telling the doctor he had been drinking alcohol for the last nine to 10 days, was seeing and hearing things, and could not remember the last two years of his life. He also stated he was taking the prescription Trazodone. Open source research states Trazodone is an antidepressant prescription used to treat depression, anxiety, and insomnia.

## CONCLUSION

16.     Based upon the information above, your affiant submits that there is probable cause to believe that KASSIAN WILLIAM FREDERICKS, interfered with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties by intimidating flight crew members or flight attendants of the aircraft, in violation of 49 U.S.C. § 46504.

17.     This affidavit has ben reviewed and approved by First Assistant U.S. Attorney Thomas C. Bradley.

//

//

//

//

//

//



RESPECTFULLY SUBMITTED,

_____
KATIE YARBOROUGH
Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and attested
to me as true and accurate by telephone
consistent with Fed.R.Crim.P. 4.1 and
41(d)(3) for a search warrant issued
this 11th day of December 2025.

_____
HON. MATTHEW M. SCOBLE
United States Magistrate Judge
District of Alaska